Richard WILCOXON, Plaintiff,

v.

**RED CLAY CONSOLIDATED SCHOOL DISTRICT BOARD OF EDUCATION and Janay Freebery, Defendants.**

No. CIV.05–524 SLR.

United States District Court, D. Delaware.

June 30, 2006.

**238**

Jeffrey K. Martin, Margolis Edelstein, Wilmington, DE, Counsel for Plaintiff.

Barry M. Willoughby, Young, Conoway, Stargatt & Taylor, Wilmington, DE, Counsel for Defendants.

## MEMORANDUM OPINION

SUE L. ROBINSON, Chief Judge.

## I. INTRODUCTION

Plaintiff Richard Wilcoxon ("plaintiff") filed the present action on July 22, 2005, alleging claims pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e) et seq., Title I of the Civil Rights Act of 1991 and the First Amendment of the United States Constitution against Red Clay Consolidated School District ("District") and Janay Freebery ("Freebery") (collectively called "defendants").[1] (D.I. 1 at ¶ 1) Plaintiff seeks injunctive relief and damages. (*Id.*) Presently before the court is defendants' motion to dismiss plaintiff's First Amendment, wrongful termination, breach of the covenant of good faith and fair dealing and defamation claims.[2] (D.I.7) The court has jurisdiction pursuant to 28 U.S.C § 1331, § 1343, § 1367 and 42 U.S.C. § 1988. (*Id.* at ¶ 5) For the following reasons, the court denies defendants' motion to dismiss the First Amendment retaliation and wrongful termination claims. The court grants defendants' motion to dismiss plaintiff's breach of the covenant of good faith and fair dealing claim. The court denies defendant's motion to dismiss plaintiff's defamation claim.

## II. BACKGROUND

Plaintiff began his employment with defendant District in October of 2002. (D.I. 1 at ¶ 6) He was employed as a Physical Education and Health teacher at Skyline Middle School in Pike Creek, Delaware. (*Id.*) Throughout the fall and winter of 2002, plaintiff team-taught[3] with a long-term substitute teacher who was filling in for defendant Freebery. (*Id.* at ¶ 7) Defendant Freebery returned from sabbatical in early 2003 and began team-teaching

---

1. Defendant District is and was at all times relevant to this action a Delaware public school district operating under the laws of and within the State of Delaware. (D.I. 1 at ¶ 3) Likewise, defendant Freebery is and has at all times relevant to this suit been a resident of the State of Delaware. (*Id.*)

2. Respectively, these claims are listed as counts III—VI in plaintiff's complaint. (D.I. 1 at ¶ 86–97)

3. Team-teaching is a style of teaching whereby two teachers work together to teach a large group of children a single subject. The methodology is premised on the idea that the two teachers' combined knowledge will provide a more meaningful learning experience for the students. (D.I. 1 at ¶ 7)

with the plaintiff. (*Id.*) Upon returning to work, plaintiff alleges that defendant Freebery was frequently tardy or absent during class time.[4] (*Id.* at ¶ 9)

In the fall of 2003, plaintiff and defendant Freebery continued to team-teach. (*Id.* at ¶ 11) They conducted the Student Leader Program each morning and jointly taught physical education and health classes. (*Id.*) Once again defendant Freebery arrived late almost every day and on some occasions did not arrive until morning duty was over. (*Id.* at ¶ 12) Furthermore, she frequently left the classroom during regular class time, forcing plaintiff to cover her portion of the class. (*Id.*) According to plaintiff, defendant Freebery's reasons for leaving class were not legitimate[5] and, in October of 2003, plaintiff confronted defendant Freebery to inform her that it was unfair for her to continually impose her class responsibilities on him. (*Id.* at ¶ 13, 15)

Shortly thereafter, plaintiff learned from other teachers that defendant Freebery had told members of the staff and administration that plaintiff was "difficult to work with." (*Id.* ¶ 16) Plaintiff sought advice from Linda Filer and Tom Karpinski, two senior members of the teaching staff. (*Id.* at ¶ 17) Plaintiff was counseled to keep a written journal of dates and times when defendant Freebery was absent, as well as other pertinent information about defendant Freebery's conduct. (*Id.* at ¶ 18)

Plaintiff believed that the journal would protect him from any discipline in the event that a student was injured while defendant Freebery was absent from the class. (*Id.*) Plaintiff took Ms. Filer and Mr. Karpinski's advice and began recording defendant Freebery's absences and actions in a journal which was kept locked in his office. (*Id.*)

On December 15, 2003, plaintiff was ill and reported off from work. (*Id.* at ¶ 19) That day, acting Assistant Principal Rumford entered plaintiff's office to locate plaintiff's student list for the substitute.[6] (*Id.* at ¶ 19–20) The student list was never located but Mr. Rumford did locate the journal and gave it to defendant Freebery, who subsequently turned it over to Acting Principal Basara.[7] (*Id.*) Shortly thereafter, Mr. Rumford called plaintiff and informed him of these events. (*Id.* at ¶ 20)

When plaintiff returned to work the next morning, he was required to meet with Ms. Basara to discuss the journal. (*Id.* at ¶ 23) Plaintiff explained his reasons for keeping the journal but was verbally reprimanded by Ms. Basara.[8] (*Id.*) Ms. Basara also demanded to know the identity of those who advised him to keep the journal. (*Id.*) Fearing that Ms. Basara would retaliate against Ms. Filer and Mr. Karpinski, plaintiff only revealed Ms. Filer's name. (*Id.*) Later that day, plaintiff and Ms. Filer met with Mr. Rumford to ensure that Mr.

4. Plaintiff did not report defendant Freebery's actions during the 2002–2003 school year because of his status as a new teacher and the fact that defendant Freebery was recently divorced and a single mother. (D.I. 1 at ¶ 10)

5. Plaintiff claims that defendant Freebery used this time to have breakfast with her boyfriend, work on her Master's degree project or watch her daughter's swim lessons. (D.I. 1 at ¶ 13—14)

6. Plaintiff claims that "Mr. Rumford's justification for going into [plaintiff's] locked office

is dubious due to the fact that Mr. Rumford has access to [plaintiff's] student list on his own computer." (D.I. 1 at ¶ 20)

7. Mr. Rumford claimed that he did not read the journal and only gave it to defendant Freebery so that she could determine if the information therein would be helpful to plaintiff's substitute. (D.I. 1 at ¶ 20)

8. This was the first time in his teaching career that plaintiff was subject to discipline. (D.I. 1 at ¶ 21)

Rumford would not reveal Ms. Filer's identity to defendant Freebery. (*Id.* at ¶ 24)

On December 17, 2003, Ms. Basara called plaintiff into her office in order to find out the identity of the other staff member who advised him to record defendant Freebery's absences. (*Id.* at ¶ 25) Ms. Basara informed plaintiff of the numerous ways that she could ascertain the information and also stated that they would have to determine how plaintiff and defendant Freebery could finish out the rest of the year working together. (*Id.*) When plaintiff questioned why Ms. Basara limited her statement to "the rest of the school year," Ms. Basara replied, "[Y]ou're not tenured are you?" [9] (*Id.*)

Later that day, plaintiff was unexpectedly called into another meeting. (*Id.* at ¶ 26) In attendance were defendant Freebery, Mr. Rumford and Ms. Basara. (*Id.*) During the meeting, defendant Freebery repeatedly demanded to know the identities of the staff members who advised him to keep the journal. (*Id.*) When he refused to reveal Ms. Filer and Mr. Karpinski, defendant Freebery accused plaintiff of saying inappropriate things to her and threatened to file a sexual harassment complaint against him.[10] (*Id.*)

After school concluded that day, plaintiff again met with Mr. Rumford and Ms. Basara to complain about defendant Freebery's false accusations and threats. (*Id.* at ¶ 31) In the course of the meeting, plaintiff noted that defendant Freebery had never voiced concern over anything that plaintiff had said prior to the discovery of the journal. (*Id.*) When he inquired into what he said that offended defendant Freebery, he received no answer but "both

Mr. Rumford and Ms. Basara indicated that [defendant] Freebery was not uncomfortable with anything [plaintiff] had said until the journal was found." (*Id.*) Ms. Basara also assured plaintiff that he was not in trouble. (*Id.*) Plaintiff then informed Ms. Basara that defendant Freebery frequently brought up the topic of sex in the course of their conversations. (*Id.*)

On January 22, 2004, plaintiff received a letter in his school mailbox at 11:30 a.m. stating that he needed to report to Ms. Basara's office for an after-school meeting. (*Id.* at ¶ 33) Plaintiff was not informed of the topic of the meeting or who would be present. (*Id.*) When he asked Ms. Basara whether the meeting warranted union representation, she informed him that "it might." (*Id.*) Plaintiff requested that two union representatives attend the meeting but they were unable to because of the short notice. (*Id.*) When plaintiff informed Ms. Basara of his inability to secure union representation, she informed him that he was still required to attend because she had already arranged for other individuals to be present.[11] (*Id.* at ¶ 34)

At the meeting, Ms. Basara presented plaintiff with a disciplinary letter concluding that he had made inappropriate comments about defendant Freebery. (*Id.* at ¶ 35) Because plaintiff disagreed with the conclusions in the letter, plaintiff refused to sign it. (*Id.*) He then informed Ms. Basara that before the meeting proceeded any further, he wanted to have union representation present. (*Id.*) Ms. Basara refused his request and instructed him not to leave until he received two other disciplinary letters. (*Id.*) The second disciplinary letter referred to plaintiff's failure to in-

9. Plaintiff interpreted this as a direct threat to his career. (D.I. 1 at ¶ 25)

10. Plaintiff denies making any inappropriate statements. (D.I. 1 at ¶ 26)

11. Frank Rumford and Bob Bartoli attended the January 22, 2004 meeting. (D.I. 1 at ¶ 34)

clude a class list or bell schedule in his emergency lesson plans.[12] (*Id.* at ¶ 36) When plaintiff asked to see the lesson plans, he was informed that they did not have them. (*Id.*) The third disciplinary letter referenced plaintiff's failure to sign up for after-school bus duties. (*Id.* at ¶ 37) As a result, other teachers and administrators had to make up for his absences.[13] (*Id.*)

On February 22, 2004, plaintiff filed with the Delaware Department of Labor a Charge of Discrimination, alleging gender discrimination.[14] (*Id.* at ¶ 46) On February 25, 2004, plaintiff met with Anthony Orga, Director of Secondary Education for the District. (*Id.* at ¶ 43) Plaintiff informed Mr. Orga of the events that had transpired between himself and Ms. Basara, defendant Freebery and Mr. Rumford. (*Id.*) He also expressed concerns about his treatment by defendant District. (*Id.*) After the meeting, plaintiff wrote Mr. Orga a number of letters following up on the topic. (*Id.*) He never received a response. (*Id.*)

On April 21, 2004, Ms. Basara entered plaintiff's classroom and informed him that she was going to conduct an unannounced observation.[15] (*Id.* at ¶ 48) After the ob-

servation, plaintiff immediately contacted Mr. Orga because he felt that Ms. Basara's objectivity was tainted due to her knowledge that he had filed a Charge of Discrimination against defendant District. (*Id.* at ¶ 50)

Plaintiff received negative results from Ms. Basara. (*Id.* at ¶ 51) This was the first negative observation plaintiff had ever received. (*Id.*) Plaintiff again contacted Mr. Orga expressing his misgivings about Ms. Basara's objectivity. (*Id.* at ¶ 54) He also carbon copied the Superintendent of defendant District requiring that the letter be stricken from his personnel file. (*Id.*) In response, Mr. Orga informed plaintiff that Ms. Basara had done nothing improper and that the poor observation would remain in the file. (*Id.*)

On May 5, 2004, plaintiff was called into another meeting with Ms. Basara. (*Id.* at ¶ 55) Ms. Basara retained the services of Tom Meade, a union representative, to act on plaintiff's behalf.[16] (*Id.*) At the meeting, Ms. Basara presented plaintiff with another disciplinary letter addressing plaintiff's failure to properly secure a small sum of money he received from students for an American Heart Association event

**12.** Emergency lesson plans are plans the teacher stores in the main office in case the teacher is unable to come to school on any particular day. (D.I. 1 at ¶ 36) The plans include everything that a substitute teacher would need to know to run the teacher's class. (*Id.*)

**13.** Plaintiff claims that on January 7, 2004, another faculty member made an error in signing up for bus duty. (D.I. 1 at ¶ 38) Because of the error, numerous students were crowded onto buses. (*Id.*) The teacher was not disciplined. (*Id.*)

**14.** Defendant District became aware of plaintiff's filing with the Department of Labor in mid to late March 2004. (D.I. 1 at ¶ 47)

**15.** An observation is where an administrator observes a class and details the teacher's ef-

fectiveness and the students' response. (D.I. 1 at ¶ 48) Based on the observations, the administrator makes a subjective determination about the teacher's effectiveness. (*Id.*) If the teacher is deemed ineffective, he or she is put on an Individual Improvement Plan designed to correct the alleged deficiencies. (*Id.*) Failure to improve can be grounds for termination. (*Id.*) Contrary to an announced observation, an unannounced observation occurs when an administrator shows up at the teacher's classroom with no advanced notice or preliminary discussion with the teacher to be observed. (*Id.*)

**16.** Plaintiff points out that Mr. Meade was not personally chosen by the plaintiff. (D.I. 1 at ¶ 55)

which was subsequently stolen from his desk.[17] (*Id.* at ¶ 56)

On May 11, 2004, plaintiff was informed by a union representative that he was to meet with Ms. Basara later that day. (*Id.* at ¶ 61) Plaintiff was given another disciplinary letter, this time stating that plaintiff's lesson plans were inappropriate.[18] (*Id.*) Defendant Freebery, using the same lesson plans, never received negative comments. (*Id.* at ¶ 62)

On May 14, 2004, plaintiff was again called into Ms. Basara's office for a meeting. (*Id.* at ¶ 69) Although Ms. Basara had secured union representation for plaintiff, he objected to the meeting because he had not been given forty-eight hours notice pursuant to Article 4:4.1 of the Collective Bargaining Agreement between defendant District and the Red Clay Education Association Affiliate of NCCEA–DSEA–NEA, Inc. ("Collective Bargaining Agreement").[19] Notwithstanding plaintiff's objection, Ms. Basara proceeded with the meeting and handed plaintiff a letter stating that defendant District would not renew his contract for the following school year. (*Id.* at ¶ 69) When plaintiff requested the reasons for non-renewal, he was sent a letter stating that he was terminated because of poor lesson plans, poor classroom management and for making inappropriate comments.[20] (*Id.* at ¶ 70)

On June 9, 2004, plaintiff filed another Charge of Discrimination with the Dela-ware Department of Labor claiming retaliation by defendant District for his filing the original charge of discrimination. (*Id.* at ¶ 75) After conducting an investigation, the Department of Labor found reasonable cause to believe that plaintiff was disciplined and terminated in a discriminatory manner by defendant District in retaliation for filing the Charges of Discrimination. (*Id.* at ¶ 77) Accordingly, plaintiff was issued a Final Determination and Right to Sue Notice on April 25, 2005. (*Id.*)

## III. STANDARD OF REVIEW

 In analyzing a motion to dismiss pursuant to Rule 12(b)(6), the court must accept as true all material allegations of the complaint and it must construe the complaint in favor of the plaintiff. *See Trump Hotels & Casino Resorts, Inc. v. Mirage Resorts, Inc.*, 140 F.3d 478, 483 (3d Cir.1998). "A complaint should be dismissed only if, after accepting as true all of the facts alleged in the complaint, and drawing all reasonable inferences in the plaintiff's favor, no relief could be granted under any set of facts consistent with the allegations of the complaint." *Id.* Claims may be dismissed pursuant to a Rule 12(b)(6) motion only if the plaintiff cannot demonstrate any set of facts that would entitle him to relief. *See Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). The moving party has the burden of persuasion. *See Kehr Packages,*

---

17. Plaintiff notes that two other teachers had failed to secure money properly that same year but were not disciplined. (D.I. 1 at ¶ 56)

18. In 2003, plaintiff received a grade of "exemplary" for instructional planning on his Performance Appraisal. (D.I. 1 at ¶ 67)

19. The collective bargaining agreement was effective at all times relevant to this suit.

20. Notwithstanding the reasons detailed in the termination letter, in plaintiff's June 10, 2004 yearly performance appraisal, he was given an "effective" rating for his classroom management. (D.I. 1 at ¶ 76) Further, at plaintiff's Non–Renewal Hearing on July 28, 2004, Dr. Andrzejewski, Superintendent of defendant District, acknowledged that two of the reasons should not be considered because there was no conclusive evidence of inappropriate comments or poor lesson plans. (*Id.* at ¶ 70)

*Inc. v. Fidelcor, Inc.*, 926 F.2d 1406, 1409 (3d Cir.1991).

## IV. DISCUSSION

### A. Plaintiff's First Amendment Claim

█ Defendants argue that plaintiff cannot maintain a proper claim under the First Amendment because he did not engage in protected speech. In evaluating whether speech by a public employee warrants constitutional protection, the court must engage in a three-step analysis. First, the court determines whether the public employee spoke as a citizen or an employee. *Garcetti v. Ceballos*, —— U.S. ——, 126 S.Ct. 1951, 164 L.Ed.2d 689 (2006). Second, the court determines whether, in light of the content, form and context of the entire record, the speech touched on matters of public concern. *Connick v. Myers*, 461 U.S. 138, 146, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983). Third, the value of the employee's speech must outweigh "the government's interest in the effective and efficient fulfillment of its responsibilities to the public." *Id.* at 150, 103 S.Ct. 1684. Determining whether the speech touched on matters of public concern and whether the value of the speech outweighs governmental interests in efficiency are questions of law for the court. *Id.* at 148, 103 S.Ct. 1684. Accordingly, a discharged public employee has no right to judicial review if the expression is not related to a matter of public concern or, even if it is so related, its value is outweighed by the need to permit the government to take actions that promote efficiency and effectiveness.[21] *Id.*

█ A public employee's speech is protected if he speaks "as a citizen on a matter of public concern." *Garcetti*, 126

S.Ct at 1958 (citing *Pickering v. Bd. of Educ. Of Tp. High Sch.*, 391 U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968)). *Garcetti* held that when public employees make statements pursuant to their official duties, an employee is not speaking as a citizen for First Amendment purposes. *Id.* Therefore, the Constitution would not insulate the employee's communications from employer discipline. *Id.* Plaintiff's journal containing the absences of a fellow teacher was not written pursuant to his official duties as a teacher. He was not employed to monitor the absences of fellow teachers, and defendants do not allege that he was required to do so.

█ "An employee's speech addresses public concern when it can be 'fairly considered as relating to any matter of political, social, or other concern to the community.'" *Feldman v. Philadelphia Housing Authority*, 43 F.3d 823, 829 (3d Cir.1994) (quoting *Connick*, 461 U.S. at 146, 103 S.Ct. 1684). In this respect, courts focus on the content, form, and context of the activity in question. *Connick*, 461 U.S. at 147–148, 103 S.Ct. 1684. "The content of the speech may involve a matter of public concern if it attempts 'to bring to light actual or potential wrongdoing or breach of public trust on the part of government officials.'" *Baldassare v. New Jersey*, 250 F.3d 188, 194 (3d Cir.2001) (quoting *Holder v. City of Allentown*, 987 F.2d 188, 194 (3d Cir.1993)).

█ The District of Delaware previously has held that issues of student safety were matters of public concern. *McHugh v. Bd. of Edu. Of the Milford Sch. Dist.*, 100 F.Supp.2d 231, 240 (D.Del.2000)(finding a matter of public concern when Supervisor of Transportation filed charges of official

---

21. Because defendants have only addressed whether plaintiff's speech involved matters of public concern, the court will assume for purposes of this opinion only that plaintiff meets the second prong of the First Amendment analysis.

misconduct against Board members after Board failed to act on Supervisor's investigations into bus driver safety). Notwithstanding defendants' assertion that the information contained in the journal was of "quintessential private concern particular to [the plaintiff]," the detailed account of a public school teacher's dereliction of duty to her students and co-workers is a matter of public concern. Based on the facts as pleaded, defendant Freebery established a pattern of tardiness and frequent absence during class time. As a result, plaintiff was repeatedly placed in the position of fulfilling the responsibilities of two teachers by virtue of the team teaching methodology. Plaintiff was forced to not only educate, but to supervise and ensure the safety of an inordinately large group of children by himself.

 Defendants' argument relating to the private and personal nature of plaintiff's speech is also unavailing. While the speech was found in a private journal, courts, in conducting a First Amendment inquiry, focus not on the audience but on the nature of the information. *Baldassare*, 250 F.3d at 197. Furthermore, courts have consistently recognized that "the private nature of the statement does not ... vitiate the status of the statement as addressing a matter of public concern." *Givhan v. W. Line Consol. Sch. Dist.*, 439 U.S. 410, 414–416, 99 S.Ct. 693, 58 L.Ed.2d 619 (1979). Thus, "a speaker's motive, while often relevant to the context of speech, is not dispositive in determining whether a particular statement relates to a

matter of public concern." *Azzaro v. County of Allegheny*, 110 F.3d 968, 978 (3d Cir.1997).

Applied to the facts alleged at bar, it is of no merit that plaintiff kept the journal to protect himself from discipline in the event that a student was injured during one of defendant Freebery's absences. In evaluating the nature of the journal, the dates and times detailing defendant Freebery's truancy and other pertinent information about her actions and omissions is a matter of public concern. Based on the court's findings that plaintiff's journal was protected speech within the meaning of the First Amendment, defendants' motion to dismiss with respect to count III of the complaint is denied.

### B. Plaintiff's Wrongful Termination Claim

 Plaintiff bases his wrongful termination claim on defendant District's alleged failure to comply with 14 Del. C. § 1410(b).[22] Under the statute, a school board's reasoning for terminating a non-tenured teacher must be based on the teacher's performance appraisal or other documented materials properly placed in the teacher's personnel file. *See* 14 Del. C. § 1410(b).[23] Section 1410(b) states:

A teacher who has not completed 3 years of service in the State and/or has not completed 2 years in the employ of the terminating board may, within 7 days of receiving notice of intention to terminate services, request in writing,

22. The court finds that it may exercise supplemental jurisdiction over plaintiff's wrongful termination claim because defendant's failure to properly place disciplinary letters in his personnel file arises out of the same nucleus of operative facts surrounding the gender discrimination claim and the first amendment claim. 28 U.S.C. § 1367 (2000). Although the Third Circuit in *Lyon v. Whisman*, 45 F.3d 758, 762 (3d Cir.1995), found that a general

employer-employee relationship between the parties is not sufficient to sustain a factually distinct claim for purposes of supplemental jurisdiction, there is a more direct link between the federal claims and the state wrongful discharge claim in this case.

23. The statute does not define "properly placed." 14 Del. C. § 1410(b).

the reason(s) for such notice. **The board will provide such reason(s) in writing** and a copy of this chapter no later than 5 days after receipt of such a request, **provided that the stated reason(s) must have either been contained in the teacher's performance appraisal,** and the teacher was provided time to correct any deficiency through an individualized improvement plan or **other documented materials properly placed in the teacher's personnel file prior to said notice**... [A] teacher may request in writing a conference with the board's superintendent for the purpose of discussing the reason(s) and attempting to resolve any disputed matter. Within 10 days of receiving such a request for a conference, the superintendent shall personally provide the teacher a conference to review the matter. **The conference with the superintendent is final and conclusive.**

14 Del. C. 1410(b) (emphasis added). Defendant asserts that because the conference with the superintendent is "final and conclusive," a non-tenured teacher has no legal recourse for wrongful termination and that the superintendent's decision is not subject to judicial review. *Id. See also New Castle–Gunning Bedford Educ. Assoc. v. Bd. of Educ.,* 421 F.Supp. 960, 965 (D.Del.1976) (holding non-tenured teachers do not have a property interest in continued employment protectable by due process because a clause in the collective bargaining agreement allowed only for an informal discussion of the reasons for non-renewal); *Newnam v. Bd. of Educ.,* 350 A.2d 339, 340 (Del.1975) (finding Board does not have statutory duty to bargain with respect to renewal of a non-tenured teacher's contract and no statutory duty to justify or even discuss a decision of nonrenewal). Plaintiff, however, asserts that the reprimands he received were improperly placed in his file both because they were issued in retaliation and because

they were issued in violation of the Collective Bargaining Agreement. The court will consider each in turn.

### 1. Retaliation

 The court has declined to hold that a non-tenured teacher is completely without due process rights. It is established that unless a non-tenured teacher receives notice of termination conformable to the statute, 14 Del. C. § 1410(b), his employment must be continued the following year. *Boyce v. Alexis I. duPont Sch. Dist.,* 341 F.Supp. 678, 683 (D.Del.1972) (finding no retaliation in Boyce's instance because program plaintiff had been teaching was replaced with another program different in several respects). The plaintiff in *Boyce,* a non-tenured teacher, alleged that the true reason the school board refused to rehire him was retaliation for plaintiff's public critiques of the curriculum, in violation of the First Amendment. *Id.* at 680. The court in *Boyce* interpreted 14 Del C. § 1410(b) to require the superintendent to give his **true** reasons for nonrenewal to the non-tenured teacher upon the teacher's request; if the real reasons for an intended termination are not given, compliance with Del. C. § 1410(b) is lacking. *Id.* at 683. The *Boyce* court also accepted that even where a teacher is without tenure, "it is a violation of the Civil Rights Act for a school to refuse to [re]employ him (a) arbitrarily and capriciously for a reason not supported by substantial evidence in derogation of his Fourteenth Amendment due process rights, or (b) because he has exercised First Amendment rights of free speech." *Id.* at 686. Therefore, the *Boyce* court implied that, in the event a teacher has been retaliated against, false reasons given to explain a decision not to rehire would not conform to 14 Del. C. § 1410(b). *Id.* at 683.

 Plaintiff alleges that the first three reprimands were issued in retalia-

tion for exercising his First Amendment rights; he further contends that the unannounced classroom observation was conducted in retaliation for filing a Charge of Discrimination with the Department of Labor and that his negative review was the result of a biased observer. Plaintiff alleges that two subsequent reprimands were also issued in retaliation. It follows from *Boyce* and § 1410(b) that if the disciplinary letters were placed in plaintiff's file only in retaliation for plaintiff's exercise of his First Amendment rights and/or filing of a Department of Labor charge, they were improperly placed in the file and would not conform to 14 Del. C. § 1410(b). Plaintiff has adequately pled that the true reason for the reprimands was retaliation.[24]

### 2. Collective Bargaining Agreement

█ In addition, plaintiff asserts that the Collective Bargaining Agreement with defendant District entitles him to written notice forty-eight hours in advance of a meeting, the right to union representation of his choice, and written notification of the individuals who will attend the meeting. Article 4:4.1 of the Collective Bargaining Agreement states that,

> [i]f an employee is required to appear before the Board or an agent thereof concerning a matter which could adversely affect his/her continued employment, salary or any increments, he/she will be given prior written notice and specific reasons for such meeting or interview at least forty-eight (48) hours in advance. Any topic not included in the letter will not be covered at said meeting unless agreed to by the employee; if not agreed, it will be discussed at a later date after proper notice has been

given. The employee will also be notified in writing of additional persons who will be present. An employee required to appear in this instance will be entitled to have an Association representative of his/her choice present to advise and to represent him/her during such meeting or interview. Informal discussion with an employee by any member of the administrative staff pertaining to the employee's performance at his/her work location will not be precluded by the preceding language ... [I]f as a result of such informal discussion the employee perceives that the matter discussed could in the future adversely affect his/her continued employment ... the administrator will, upon written request, give the employee reasons in writing for the necessity of waiving the forty-eight hours' written notice prescribed above.

(D.I. 35 at 5–6) Defendants contend that plaintiff's meetings with Ms. Basara and other administrators were informal and that plaintiff was not entitled to such provisions of the Collective Bargaining Agreement. Defendants' motion to dismiss, however, will be granted only if no set of facts exists upon which relief may be granted. *Conley*, 355 U.S. at 45–46, 78 S.Ct. 99. Because the plaintiff's meeting with defendant District's agents, as pled by plaintiff, can be construed as a formal meeting requiring written notice and union representation, defendants' motion to dismiss is denied.

### C. Plaintiff's Breach of Covenant of Good Faith and Fair Dealing Claim

█ At common law, employment in Delaware is considered at will except where, among other exceptions, the termi-

---

**24.** During the conference with plaintiff to discuss the reasons for nonrenewal, the Superintendent admitted that plaintiff's reprimands for poor lesson plans and inappropriate com-

ments should not have been considered in the decision to terminate him because of a lack of conclusive evidence.

nation violated public policy. *Lord v. Souder*, 748 A.2d 393, 400 (Del.2000) (citing *E.I. DuPont de Nemours and Co. v. Pressman*, 679 A.2d 436, 442–44 (Del. 1996)). In *Schuster v. Derocili*, 775 A.2d 1029, 1039–40 (Del.2001), the Supreme Court of Delaware recognized a common law cause of action for breach of the covenant of good faith and fair dealing in an at will employment contract where the employee alleged that she was terminated following sexual harassment in the workplace.

 In 2004, the Delaware legislature amended the statute concerning employment discrimination, stating that the statute was the "sole remedy for claims alleging a violation of this subchapter to the exclusion of all other remedies." 19 Del. C. § 712(b) (2005). The synopsis of the Senate Bill expressly supercedes the court's holding in *Schuster*, stating, "This bill is the exclusive and sole remedy for employment discrimination claims, requiring initial processing of all such claims with the Department of Labor for review and action. This bill effectively re-establishes the exclusive remedy put in question by the decision in *Schuster v. Derocili* ...." Delaware Bill Summary, 2004 Reg. Sess. S.B. 154. The courts have begun to follow this interpretation of the amended statute. *See E.E.O.C. v. Avecia, Inc.*, 151 Fed.Appx. 162 (3d Cir.2005) (amended statute barred a state law claim for breach of the covenant of good faith and fair dealing); *Moon v. Del. River & Bay Auth.*, No. 05–261, 2006 WL 462551, at *4 (D.Del. Feb.24, 2006). Thus, plaintiff cannot assert a common law claim for the breach of the implied covenant of good faith and fair dealing where the Delaware state statute provides the exclusive remedy.

### D. Plaintiff's Defamation Claim

 A plaintiff must plead the five elements of a defamation claim: (1) defamatory communication; (2) publication; (3) the communication refers to the plaintiff; (4) a third party's understanding of the communication's defamatory character; and (5) injury. *Wright v. Pepsi Cola Co.*, 243 F.Supp.2d 117, 124 (D.Del.2003). Delaware law has established that some defamatory statements may fall within a privileged class for which no damages may be recovered. *Pierce v. Burns*, 185 A.2d 477, 479 (Del.1962). The plaintiff must establish, therefore, an unprivileged communication of the defamatory statement to a third party. *Stiner v. Univ. of Del.*, 243 F.Supp.2d 106, 115 (D.Del.2003). A conditional privilege "extends to communications made between persons who have a common interest for the protection of which the allegedly defamatory statements are made." *Id.* (citing *Pierce*, 185 A.2d at 479).

 A conditional privilege may be lost if abused or waived. A conditional privilege must be exercised with " 'good faith, without malice and absent any knowledge of falsity or desire to cause harm.' " *Id.* (quoting *Burr v. Atlantic Aviation*, 348 A.2d 179, 181 (Del.1975)). Thus, a conditional privilege may be abused by: (1) excessive or improper publication; (2) the use of the occasion for a purpose not embraced within the privilege; or (3) making a statement which the speaker knows is false. *Stiner*, 243 F.Supp.2d at 116 (citing *Battista v. Chrysler Corp.*, 454 A.2d 286, 291 (Del.Super.1982)). The question of whether a privilege has been abused by malice or intent to harm is ordinarily a factual question reserved for the jury. *Id.* (citing *Pierce*, 185 A.2d at 479). *See also Gonzalez v. Avon Products, Inc.*, 609 F.Supp. 1555, 1560 (D.Del.1985) (concluding that abuse of privilege concerning malice is of the type requiring investigation into the

subjective intent of the publisher and is not ordinarily a matter for summary judgment).

Defendant Freebery contends that the defamation claim must be dismissed quickly as a matter of public policy to avoid a chilling effect on other sexual harassment claims. In other words, defendant Freebery proposes that the continued subjection to a defamation claim concerning her publication of plaintiff's alleged sexual harassment will discourage others who have been sexually harassed from reporting the incident. *See Vickers v. Abbott Lab.,* 308 Ill.App.3d 393, 241 Ill.Dec. 698, 719 N.E.2d 1101, 1109 (1999) (stating qualified privilege in the defamation context protects the victims, witnesses, and investigators of sexual harassment, and if no privilege existed, victims would be "handcuffed" by the fear of defamation liability).

While certainly a concern for the court, the facts and allegations of the complaint must be construed as true for purposes of deciding the motion to dismiss. *See Trump Hotels,* 140 F.3d at 483. Plaintiff contends that defendant Freebery's allegations of sexual harassment were false and malicious and arose only after plaintiff confronted defendant Freebery with reports of her excessive absences. Given these allegations in the complaint, the factual inference that the publication of defendant Freebery's sexual harassment claim was false and malicious is not unwarranted for purposes of the motion to dismiss. *See Morse v. Lower Merion Sch. Dist.,* 132 F.3d 902, 906 (3d Cir.1997) (citing Charles 5B Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1357 (2d ed.1997)) (noting a court should not consider or regard as true "conclusory allegations of law, unsubstantiated conclusions, and/or unwarranted factual inferences"). Plaintiff has demonstrated a set of facts that, if true, entitle him to relief. The motion to dismiss is denied.

## V. CONCLUSION

For the reasons stated above, defendants' motion to dismiss the First Amendment retaliation claim and wrongful termination claim will be denied. The court grants defendants' motion to dismiss plaintiff's breach of the covenant of good faith and fair dealing claim. The court denies defendant's motion to dismiss the defamation claim.

## ORDER

At Wilmington this 30th day of June, 2006, for the reasons stated in the memorandum opinion issued this same date;

IT IS ORDERED that:

1. Defendants' motion to dismiss for failure to state a claim (D.I.7) is denied with respect to plaintiff's claims for violation of his First Amendment rights, wrongful termination, and defamation.

2. Defendants' motion to dismiss for failure to state a claim (D.I.7) is granted with respect to breach of implied covenant of good faith and fair dealing.